## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GARY KAUFMAN,

      Plaintiff,

    v.                          Civil Action No. 8:20-cv-00983-PX

CARLOS DEL TORO,
Secretary, Department of the Navy,

      Defendant.

              \*                                

***

## MEMORANDUM OPINION

Plaintiff Gary Kaufman sues the Navy through the Secretary of the Department of Navy, Carlos Del Toro, for hostile work environment, discriminatory discharge, and retaliation. ECF No. 18. The Navy moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) and Kaufman moves for leave to file a surreply. ECF Nos. 59, 64. The matters have been fully briefed, and no hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the motion for leave to file a surreply is GRANTED and the motion for summary judgment is DENIED.

## I.    Background[1]

Plaintiff Gary Kaufman ("Kaufman") is a 100% disabled veteran whom the Navy hired as part of its Wounded Warriors program. ECF No. 60-1 at 15. He suffers from multiple conditions that limit his daily activities, to include chronic and acute back pain, gastro-intestinal disorders, tinnitus, insomnia, and migraines. *Id.* at 15–18. Kaufman also suffers from other non-physical challenges such as anxiety, depression, and circulatory speech. *Id.*; ECF Nos. 59-6 &

---

[1] The Court construes the evidence in the light most favorable to Plaintiff Gary Kaufman as the non-movant. *See The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 364 n.3 (D. Md. 2011).

60-10 at 29–31.  Much of his day must be carefully planned around these varied disorders.  *See id.*

In September of 2018, Kaufman started working for the Naval Surface Warfare Center, Carderock Division (the "Agency"), as the Branch Head for Security Policy and Programs within the division Code 105.  ECF Nos. 59-6 & 60-10 at 20; ECF No. 60-1 at 25 n. 1.  The Agency allowed Kaufman to be on a "maxi-flex" work schedule wherein Kaufman could work outside "core hours," provided that he worked a minimum of 80 hours every two weeks.  ECF No. 60-1 at 26; ECF Nos. 59-6 & 60-10 at 62.  He remained at the Agency only nine months and was terminated in June 2019.

Kaufman's first line supervisor was Nancy Cooley, but in reality, his second-line supervisor, Melissa Berlo, controlled much of his workday.  Berlo had hired Kaufman, and at the time, knew he was part of the Wounded Warrior program and was considered 30% disabled from his prior military service.  ECF Nos. 59-13 & 60-4 at 16–18.  Berlo also had seen Kaufman walk with a cane and use a triggerpoint therapy cane[2], and heard him complain about his back pain.  *Id.* at 17.  Nonetheless, Berlo contends she did not know of Kaufman's specific disabilities until May of 2019, shortly before Kaufman was fired.  *Id.*; ECF No. 59-11 at 4.

About two weeks after Kaufman started at the Agency, Berlo demanded that he travel within the next week to an out-of-state audit.  ECF No. 60-1 at 13, 25; ECF Nos. 59-6 & 60-10 at 26–27.  Kaufman responded that he could not travel on such short notice.  ECF Nos. 59-6 & 60-10 at 27.  He explained that because he must bring with him assistive devices such as a noise machine, and because travel tends to exacerbate his anxiety, intestinal problems, and back pain, he must carefully coordinate the timing of his travel, where he stays, and his itinerary.  *Id.* at 27–

---

[2] A triggerpoint cane is a horn-shaped tool used to treat back pain.  *See* ECF Nos. 59-6 & 60-10 at 37.

31.  Although Berlo said nothing directly to Kaufman, she appeared to him to be "visibly irritated."  ECF No. 60-1 at 25.  Afterwards, Berlo told Cooley that "Kaufman had better learn how to prioritize his work."  ECF No. 60-3 at 1.  And Cooley understood Berlo's comment to mean the "Kaufman was not permitted to seek an accommodation, and that Berlo as upset with" him for doing so.  *Id.*  Berlo did not address Kaufman's request for accommodations.  Instead, she asked Kaufman twice more to travel on short notice.  ECF No. 60-1 at 25–26.

Almost immediately after Kaufman's initial request for longer notice, Berlo appeared to turn on Kaufman.  She began to assign Kaufman projects with unrealistic deadlines.  *See, e.g.*, ECF No. 60-1 at 33, 38; ECF No. 60-15 at 44; ECF No. 60-3 at 4.  When Kaufman's colleague, Cliff Young, asked about Berlo's assignments, Berlo admitted to Young that she was trying to "set [Kaufman] up" and "catch him" making mistakes at work.  ECF No. 60-15 at 44.  Similarly, Cooley describes Berlo as having become "singularly focused" on Kaufman, and that Berlo "undermin[ed], and target[ed] Mr. Kaufman on everything," including "his work products, attendance, medical appointments, or anything she could create issues with."  ECF No. 60-3 at 2, 4.  According to Cooley, Berlo purposely kept Kaufman "in a constant state of confusion."  ECF No. 60-15 at 8.

Over the course of Kaufman's employment, Berlo's management decisions reasonably could be interpreted as consistent with this "set up" theory.  Although Kaufman was the Branch Head for Security Policy and Programs to whom several employees reported directly, Berlo disregarded this supervisory structure.  Berlo, for example, assigned tasks directly to Kaufman's subordinates without his knowledge or input.  *See, e.g.*, ECF No. 59-11 at 15–16, 24; ECF No. 60-15 at 8.  She also disparaged Kaufman's supervisory style and even went so far as to instruct one of Kaufman's subordinates to disregard his directives.  ECF No. 60-1 at 27, 30–33.  She also

stripped some of Kaufman's work responsibilities and did not allow him to telework to complete training for one of his duties.  *Id.* at 30–32; *see also* ECF No. 60-15 at 8.

Worse still, Berlo's conduct continued unabated while the Agency's leaders looked the other way.  Berlo's first-line supervisor, Tamar Gallagher, the Head of the Operations Department, admitted that there were "numerous allegations" against Berlo and her supervisory style, to include her approach to Kaufman.  ECF No. 60-7 at 10.  Additionally, while Gallagher and Commanding Officer, Mark Vandroff, testified that Agency employees should follow the chain of command, *see* ECF No. 60-7 at 32; ECF No. 60-14 at 41, they also brushed off Berlo's contrary behavior as it applied to Kaufman, explaining that it was merely part of her larger "management style."  *See* ECF No. 60-14 at 41.

Also, from early on, Berlo openly mocked Kaufman's back pain.  On one occasion, Berlo called for an end-of-day Branch Heads meeting.  ECF No. 60-1 at 27.  Kaufman informed Berlo that he was unable to attend because he was tired, his back hurt, and he needed to pick up his children.  *Id.*; ECF No. 60-15 at 44.  Berlo shot back, "Wahhh, wahhh, wahhh, do you want me to get my violin?"  *Id.*  This prompted Kaufman during his October 2018 performance evaluation (which was largely positive) to ask Berlo that she stop mocking his disability.  ECF No. 60-1 at 27; *see* ECF No. 60-16 at 24–32.  Nonetheless, about a month later, Berlo happened upon Kaufman kneeling in a coworker's office and applying his triggerpoint therapy cane to his back.  ECF No. 60-1 at 28.  He was clearly in pain.  *See id.*  Berlo trained her focus on Kaufman and laughed, asking derisively if "his back was falling off."  *Id.*

Also, early in his employment, Kaufman had identified security deficiencies in one of the secured rooms at the Agency.  ECF No. 60-15 at 49; ECF No. 60-14 at 11–12.  At a meeting to discuss the deficiencies with Vandroff, Gallagher, and Berlo, Kaufman tried to voice his

concerns about the room and a related potential conflict of interest because Berlo had previously certified the room as secure.  ECF No. 60-1 at 45.  This prompted Berlo to grab Kaufman's arm so tightly she nearly broke his skin.  *Id.* at 26–27, 45.

When the meeting was over, Kaufman met with Young.  ECF No. 60-15 at 230. Kaufman was visibly upset and recounted what had happened to Young.  *Id.*  Young, in turn, encouraged Kaufman to report the incident.  *Id.* at 230, 266.  Kaufman took Young's advice and complained to Gallagher about Berlo's conduct.  ECF No. 60-1 at 29.  Gallagher informed Vandroff of the allegations but took no other action.  *See* ECF No. 60-7 at 12–13.  After the meeting, Kaufman tried to explain to Berlo "that stressful situations like this were not healthy for him" and exacerbated his mental health challenges.  ECF No. 60-1 at 27.  Berlo merely shook her head and walked away.  *Id.*

Shortly after, in November 2018, the Agency launched a command directed investigation into the timekeeping for Code 105 employees.  ECF No. 60-15 at 132.  Kaufman's time and attendance received particular scrutiny.  Berlo specifically pressed Kaufman about his whereabouts, even though he was permitted to work under a "maxi-flex" schedule and did not need to be in the office at any set time.  *See* ECF Nos. 59-6 & 60-10 at 62; ECF No. 60-1 at 26. This was so even when Kaufman told Cooley, his direct supervisor, of necessary medical appointments which required his absence.  ECF No. 60-1 at 28; ECF No. 60-3 at 2.  In such an instance, Berlo admonished Kaufman for taking sick leave to attend to his medical needs.  *Id.*

On December 11, 2018, Kaufman filed an Equal Employment Opportunity ("EEO") complaint against Berlo, alleging disability discrimination and retaliation.  ECF No. 60-15 at 1. On December 18, 2018, the EEO Office sent Berlo an email informing her of the complaint. ECF No. 60-15 at 47.  That same day, Berlo yelled at Kaufman in Cooley's office so loudly the

entire office could hear.  ECF No. 60-1 at 28; ECF No. 60-15 at 222, 230.  Berlo disputes this account and instead says that Kaufman was the one who yelled and was "physically aggressive" towards her.  ECF Nos. 59-13 & 60-4 at 32.  After the incident, Cooley suggested Kaufman go home because he was "so shaken."  ECF No. 60-1 at 28; ECF No. 60-15 at 50.

That night, Kaufman went back to work.  ECF No. 60-1 at 29.  But when he left, he evidently did not make sure an interior door was locked.  *Id.*; ECF No. 60-2 at 1.  Vandroff initiated an informal investigation into the unlocked door.  ECF No. 60-14 at 11–12.  In the end, the investigation revealed that the lock itself was failing and needed to be replaced, and no confidential information had been leaked or compromised.  *Id.* at 11; ECF No. 60-15 at 108–113; *see also* ECF No. 59-31.

Meanwhile, Kaufman was dissatisfied with the Agency's response to his complaints about Berlo's conduct.  In January 2019, Kaufman filed a criminal complaint against Berlo with the Navy's Criminal Investigation Division concerning the arm-grabbing incident.  ECF No. 60-1 at 30.  Detective Jody Karlin interviewed several current and former employees who collectively attested to Berlo's history of volleying widespread verbal assaults against them and others.  *See* ECF No. 60-15 at 222–26, 270–95.  Many also discussed that they feared retaliation should they speak against her.  *See, e.g.*, *id.* at 215, 220, 225, 270–95.  One employee noted that since Berlo's anger "now seems to be directed at [her] co-worker Gary Kaufman," she commensurately caught less of Berlo's ire.  *Id.* at 282.  Detective Karlin completed this investigation by March of 2019 and submitted the report to Gallagher and Vandroff.  *Id.* at 257–58; ECF No. 60-7 at 16–18.  Berlo was neither criminally charged nor formally reprimanded for her conduct.

Also, by this time, Kaufman had retained counsel.  In January 2019, his counsel requested that Kaufman be physically separated from Berlo and removed from her chain of command.  ECF No. 60-15 at 99.  Vandroff and Gallagher, in response, set-up a meeting for all Code 105 leaders.  ECF No. 60-14 at 27.  Cooley voiced that she believed such a meeting to be a bad idea given the pending assault investigation and claims from "the majority of her staff" that Berlo was creating a hostile and toxic work environment.  ECF No. 60-16 at 37.  Kaufman also informed Vandroff directly that with his EEO complaint against Berlo still pending, he wished to meet separately from Berlo for fear of reprisal.  ECF No. 60-16 at 38–40.  This request was denied, and the meeting took place as planned.  *See* ECF No. 60-14 at 44.  Kaufman also renewed his request to be separated from Berlo's chain of command, which again was rejected.  ECF No. 60-1 at 51–52.

Vandroff, however, did call for a command directed investigation against Berlo regarding the hostile work environment claims.  ECF No. 60-14 at 18–20.  Several employees participated, many describing Berlo's hot temper, autocratic command style, and unrelenting harassment that created a "toxic" workplace.  ECF No. 60-15 at 62–95.  Notwithstanding this, Vandroff ultimately concluded "that all of . . . Ms. Berlo's [employment related] actions were appropriate" and "[n]one of them crossed the line into what [he] would consider hostile or inappropriate."  ECF No. 60-14 at 29.  And as for Kaufman, Vandroff opined that Kaufman simply "needed to do his job under Ms. Berlo."  *Id.*

Next, in March 2019, the time and attendance investigation drew to a close.  The Agency investigators found widespread noncompliance involving all Code 105 employees.  ECF No. 60-15 at 132–159; *see also* ECF No. 60-1 at 57–58.[3]  Agency leaders concluded that the difficulties

---

[3]  The time and attendance calculation processes at the Agency were undisputedly complicated in that employees had to complete physical timesheets, electronically input their time at the end of a given period, and

attendant in the reporting requirement meant that no individual discipline should follow, and instead employees would start with a "clean slate" going forward.  ECF No. 60-7 at 30–32; ECF Nos. 59-12 & 60-12 at 27.

This was not the case for Kaufman.  Berlo continued scrutinizing Kaufman's recorded time in six-minute increments and met with him to discuss his discrepant entries.  ECF No. 60-1 at 33; ECF No. 60-3 at 4; *see also* ECF No. 60-15 at 36.  Berlo also admonished Kaufman for going into the office outside of working hours and revoked his ability to do so in the future.  ECF No. 60-1 at 34.  According to Berlo, Kaufman needed her approval to go into the office after hours despite his "maxi-flex" schedule, ECF No. 59-11 at 52; ECF Nos. 59-13 & 60-4 at 22, and even though Cooley had authorized Kaufman's after hours work and "had no concerns about Mr. Kaufman's work habits."  ECF No. 60-3 at 4.  Berlo also raised with Meg McConnell, the Agency's Labor and Relations Director, her concerns about Kaufman's time.  ECF No. 60-15 at 174–75.  McConnell responded that Kaufman's time, "with the exception of a few days," did not show "overwhelming" differences in time reported versus time in the office.  *Id.*

Nonetheless, on May 22, 2019, Berlo and McConnell met with Kaufman to review his timekeeping.  ECF No. 60-1 at 35; ECF No. 59-11 at 57–58.  He was the only employee for whom such meeting was arranged.  ECF Nos. 59-12 & 60-12 at 13; ECF Nos. 59-13 & 60-4 at 45.  When they questioned Kaufman about his time, down to five-minute increments, they would not let him review his time sheets and instead mocked his lack of recall.  ECF No. 60-1 at 35; ECF Nos. 59-6 & 60-10 at 43–46; *see also* ECF No. 59-24.  Cooley, also present at the meeting, observed that McConnell and Berlo "treated Mr. Kaufman worse than a criminal" and appeared fixed on "get[ting]" Kaufman.  ECF No. 60-3 at 4–5.  Kaufman, once again, expressed to

---

swipe their badges which tracked time in the building.  *See* ECF No. 59-15 at 13–14.  Further, from Kaufman's perspective, the captured time across the time-keeping methods "var[ied] significantly."  ECF No. 60-1 at 48.

McConnell that he viewed this meeting as "a continuation of [his] hostile work environment." ECF No. 60-15 at 39; ECF No. 60-1 at 35.

After that meeting, Kaufman asked to take leave under the Family Medical Leave Act ("FMLA"). As grounds, Kaufman explained that his mental health had deteriorated given Berlo's persistent adverse treatment of him. ECF No. 60-1 at 35. McConnell required Kaufman to obtain additional medical documentation to support his leave. *Id.*; ECF No. 60-16 at 76. And after Kaufman provided it, McConnell demanded that he provide further medical justification. ECF No. 60-16 at 75. Cooley, however, recommended Kaufman's FMLA request be granted and conveyed to McConnell that she was "very uncomfortable with denying or prolonging [Kaufman's FMLA] request" because he qualified for the leave. *Id.* at 75–76; ECF No. 60-15 at 197–99. McConnell ultimately approved Kaufman's FMLA leave. *See* ECF No. 60-15 at 200.

Within a week, the Agency appointed Deputy of the Operations Department, Feza Koprucu, as the final decisionmaker on whether Kaufman should be fired. *See* ECF No. 60-7 at 7–8; ECF No. 60-15 at 206–11. Koprucu up to that point had zero interaction with Kaufman or his work for the Agency. *See* ECF No. 60-7 at 22–24; ECF Nos. 59-9 & 60-11 at 9; ECF No. 60-1 at 50. Gallagher formally delegated authority to Koprucu as to three command directed actions. ECF No. 60-7 at 22–23; ECF No. 60-15 at 206–11; ECF Nos. 59-9 & 60-11 at 6. Next, McConnell supplied Koprucu with the command initiated investigations and some nonspecific "packet" of "evidence" about Kaufman for Koprucu's review. ECF Nos. 59-12 & 60-12 at 9–17. This included information received directly from Berlo regarding Kaufman's alleged shortcomings. *See id.*; ECF Nos. 59-13 & 60-4 at 26.

Koprucu, in turn, conducted no independent investigation. ECF Nos. 59-9 & 60-11 at 3–4, 25. In fact, when probed at his deposition, Koprucu could recall none of the specific reasons

why Kaufman's termination was warranted other than what was written in Kaufman's termination letter, which McConnell had drafted for Koprucu.  *Id.* at 3–4, 10–19.  Nor did he or any of the Agency leaders contemplate any lesser corrective action.  *See* ECF Nos. 59-12 & 60-12 at 13.

On April 17, 2020, Kaufman initiated this lawsuit.  ECF No. 1.  After the Court resolved the Agency's motion to dismiss in his favor, Kaufman filed the operative Amended Complaint, alleging that the Agency subjected him to a hostile work environment (Count I), discriminatory discharge (Count II), retaliatory harassment (Count III), and retaliatory discharge (Count IV)— all on account of his disability and in violation of the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794.  ECF No. 18 ¶¶ 246–69.  The Navy moved for summary judgment on May 19, 2023, and Kaufman moved for leave to file a surreply on August 3, 2023.  ECF Nos. 59, 64.  The Court first addresses Kaufman's motion and next turns to the propriety of summary judgment.

## II.     Kaufman's Surreply in Response to the Navy's Request to Strike Kaufman's Exhibits

Kaufman urges the Court to permit his surreply so that he may respond to an evidentiary argument the Navy raises for the first time in its reply.  ECF No. 64.  Specifically, the Navy contends that the Court should strike two exhibits as inadmissible hearsay.  ECF No. 63 at 3–4.  Although surreplies are generally disfavored, *Courtney-Pope v. Bd. of Educ.*, 304 F. Supp. 3d 480, 485 (D. Md. 2018), they are warranted "when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply."  *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003) (citation omitted) *aff'd*, 85 F. App'x 960 (4th Cir. 2004).  Thus, in fairness to Kaufman, the Court grants his motion and will consider the surreply.

As to the challenged documents, the Government maintains that the Court should not consider any of the information included within two command directed investigation reports because they are "hearsay." ECF No. 63 at 3–4.[4]  This argument sweeps too broadly.  Federal Rule of Civil Procedure 56(c) makes clear that facts considered in a motion for summary judgment "need not be in the admissible form."  *Wake v. Nat'l R.R. Passenger Corp*., No. 12-1510, 2013 WL 5423978, at *1 (D. Md. Sept. 26, 2013).  Instead, they are proper to consider when such facts "*could* be put in admissible form."  *Id.* (emphasis in original).  The investigative reports include firsthand accounts of relevant events, many of which bear particular indicia of reliability.  *See, e.g.*, ECF No. 60-15 at 44, 299; ECF No. 60-9 at 10.  The reports, for example, include witness statements submitted under oath on matters relevant to Kaufman's claim.  *See id.* Thus, for summary judgment purposes, the Court may consider firsthand accounts included within the reports to the extent such evidence is relevant and probative.  *See* Fed. R. Civ. P. 56(c)(1)(A).

The Court next turns to the Navy's motion.

## III.   Motion for Summary Judgment

### A.  Standard of Review

Summary judgment is appropriate when the Court, viewing the evidence in the light most favorable to the non-moving party, finds no genuine dispute of material fact, entitling the movant to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Where the party bearing the burden of proving a claim or defense "fails to make a showing sufficient to establish the

---

[4]  The Government also objects in passing to the Court considering the Agency's Command Investigation Handbook.  ECF No. 63 at 15.  The Court does not find the handbook relevant to determining the merits of the summary judgment motion, and so, it need not reach this argument.

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment against that party is warranted. *Celotex*, 477 U.S. at 322. "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" *Emmett*, 532 F.3d at 297 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another." *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). However, "a court should not grant summary judgment 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" *Campbell v. Hewitt, Coleman & Assocs., Inc*., 21 F.3d 52, 55 (4th Cir. 1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co*., 381 F.2d 245, 249 (4th Cir. 1967)).

### B. Analysis

#### 1. Hostile Work Environment (Count I)

Turning first to the hostile work environment claim, Kaufman avers that Berlo had created an utterly intolerable work environment once she learned of Kaufman's particular disabilities. ECF No. 18 ¶¶ 246–52. To survive summary judgment, Kaufman must point to some record evidence that he faced "sufficiently severe or pervasive" conduct that altered the conditions of his employment; that such conduct was on account of his disability; and that it was imputable to his employer. *Pueschel v. Peters*, 577 F.3d 558, 564–65 (4th Cir. 2009) (quoting *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003) (en banc)).

The Navy first argues that the sole evidence supporting the claim amounts to Kaufman's "personal account," which cannot be considered.  ECF No. 59-1 at 24.  The Navy misapprehends the universe of relevant evidence.  To be sure, a plaintiff's firsthand account of *what happened* is admissible.  *Cf. Lovett v. Cracker Barrell Old Country Store, Inc.*, 700 Fed. Appx. 209, 212 (4th Cir. 2017) ("courts have 'long ago buried—or at least tried to bury—the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgement because it is self-serving'") (quoting *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) (internal quotation marks omitted)); *cf. Evans v. Techs. Applications & Servs. Co.*, 80 F.3d 954, 959, 962 (4th Cir. 1996) (quoting *Goldberg v. B. Green and Co.*, 836 F.2d 845, 848 (4th Cir. 1988)) (holding plaintiff's "naked opinion, without more" cannot establish a prima facie case of discrimination).  Like any other witness, the plaintiff may testify about his personal knowledge: what he saw, heard, or experienced.  *Lovett*, 700 Fed. Appx. at 212.  Thus, to the extent Kaufman offers a firsthand account of relevant events, the Court will consider it.  *See, e.g.*, ECF Nos. 60-1, 59-6 & 60-10.

The Navy next contends that the evidence, at best, amounts to Berlo's "routine managerial decisions," for which no reasonable factfinder could infer a sufficient hostile work environment.  ECF No. 63 at 9–10.  The Government, in essence, tries to extract discrete management choices from the broader evidence of Berlo's ongoing harassment.  *See id.*  The evidence, however, is sufficient to sustain the claim.

Construing the record most favorably to Kaufman, Berlo launched a self-admitted campaign to "catch him" and "set him up."  *See* ECF No. 60-15 at 44; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 317–18 (4th Cir. 2008).  Almost immediately after Kaufman's first request for disability related accommodations, Berlo assigned him unreasonable tasks; constantly

shifted her expectations; and openly mocked his physical disabilities and his need for assistance. *See, e.g.*, ECF No. 60-1 at 33, 38; ECF No. 60-15 at 44; ECF No. 60-3 at 4.  Berlo also called him stupid and lazy and physically assaulted him.  *See* ECF No. 60-15 at 44; ECF No. 60-1 at 26–27; *see also Sunbelt Rentals*, 521 F.3d at 318 ("[T]he presence of 'physical threats undeniably strengthens a hostile work environment claim.'" (quoting *White v. BFI Waste Servs.*, 375 F.3d 288, 298 (4th Cir. 2004)).  Berlo likewise led the charge to flyspeck Kaufman's time and attendance, ignored his need for flexible work hours, and undermined his ability to attend his medical appointments.  *See, e.g.*, ECF No. 60-1 at 28, 33; ECF No. 60-3 at 2.  No doubt, the Navy marshals evidence in response, which compels the case to proceed to trial—not for this Court to pick which side it believes.  *See Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979).  Because the record evidence could establish a sufficiently hostile work environment, the argument fails.

The Government also argues that even if Berlo's conduct was sufficiently hostile to alter Kaufman's working conditions, no evidence supports that such hostility was on account of his disability.  ECF No. 59-1 at 28–31.  Again, the Court must disagree.  Berlo began her campaign to "get" Kaufman immediately after he voiced the need for travel accommodations on account of his disabilities.  *See* ECF Nos. 59-6 & 60-10 at 30–31; ECF No. 60-15 at 44; ECF No. 60-3.  During the same time, Berlo revealed her utter disregard for Kaufman's disability-related needs.  She openly made fun of his physical and cognitive differences; she ignored his need for a flexible work schedule; and she directed Cooley to "warn" Kaufman that he better prioritize his work over his need for accommodation.  *See, e.g.*, ECF No. 60-1 at 26–27; ECF No. 60-3 at 1; ECF Nos. 59-6 & 60-10 at 62.  On this record, a factfinder could reasonably conclude that Berlo

created a sufficiently hostile working environment on account of Kaufman's disability.  The Court denies the motion as to Count I.

### 2.  Discriminatory Discharge (Count II)

Turning next to the discriminatory discharge claim, Kaufman avers that the Agency terminated him on account of his disability.  ECF No. 18 ¶¶ 253–57.  The Rehabilitation Act prohibits a federal agency from intentionally discriminating against an "otherwise qualified individual with a disability … solely by reason of her or his disability."  29 U.S.C. § 794(a).  A plaintiff may prove intentional discrimination through direct and indirect evidence of discriminatory animus, or through the well-established burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Bandy v. Salem*, 59 F.4th 705, 711 (4th Cir. 2023); *Hill v. Lockheed Martin Logistics, Mgt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004) (en banc), *overruled in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  "Direct evidence is 'evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision.'"  *Bandy*, 59 F.4th at 711 (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (en banc)).

Where direct evidence is lacking, the claim is subject to the *McDonnell Douglas* burden-shifting framework.  The plaintiff must first make a prima facie showing that "(1) he is disabled; (2) he is otherwise qualified for the position; [] (3) he suffered an adverse employment action *solely* on the basis of his disability"; and (4) the discriminatory intent is imputable to his employer.  *Jennings v. Frostburg State Univ.*, No. ELH-21-656, 2023 WL 4567976, at *15 (D. Md. June 27, 2023) (emphasis in original) (citing *Perry v. Comput. Sciences Corp.*, 429 F. App'x 218, 219–20 (4th Cir. 2011)); *Hill*, 354 F.3d at 291.  Upon that showing, the burden shifts to the

employer to articulate a legitimate, nondiscriminatory reason for terminating the plaintiff; at which point the burden shifts back to the plaintiff to demonstrate that the employer's stated grounds were a mere pretext for discrimination, that is "unworthy of credence." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253–56 (1981); *Walker v. Mod-U-Kraf Homes, LLC*, 775 F.3d 202, 211 (4th Cir. 2014). Importantly, under either method of proof, the plaintiff must demonstrate that his disability was the "'sole' reason for the adverse employment action, rather than one of several motivating factors." *Jennings*, 2023 WL 4567976, at *16; *see also Kelly v. Town of Abingdon*, No. 21-2261, 2024 WL 14325, at *7 (4th Cir. Jan. 2, 2024) (citing *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016)).

Attempting to defeat the claim, the Navy makes a series of somewhat disjointed arguments. Its first contention, aimed at the prima facie showing, faults Kaufman for not producing "comparator" evidence. ECF No. 59-1 at 14–16. Comparator evidence is one way to demonstrate discriminatory animus, but it is by no means the *only* way. *See Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2020) (citing *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)) ("Plaintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim."). Here, Kaufman pursues a more direct route to liability. He points to the record, replete with Berlo's words and acts, from which a factfinder could conclude Berlo targeted Kaufman to push him out of the Agency on account of his disability. *See, e.g.*, ECF No. 60-1, 60-3, 60-15. As soon as Kaufman made his disability-related needs known, Berlo announced she was out to "get" him. *See* ECF No. 60-15 at 44; ECF No. 60-3 at 4. She mocked his disability while she set unrealistic deadlines, switched up his duties, and targeted him for atypical and arguably unwarranted investigations that culminated in his termination. *See id.*; ECF No. 60-1. On this record, a reasonable juror could conclude that

Kaufman has amply demonstrated the discriminatory animus necessary for the claim to proceed. *See Kelly*, 2024 WL 14325, at *7; *Jennings*, 2023 WL 4567976, at *16.

The Navy next argues that no evidence allows a trier of fact to impute Berlo's animus onto the Agency. ECF No. 59-1 at 19–22. The Navy correctly points out that for discriminatory discharge to be actionable, the discriminatory animus must be imputable to the employer. *See Hill*, 354 F.3d at 291, 305. However, where a formal decisionmaker acts merely as a "cat's paw" or simply "rubberstamp[s]" a decision or recommendation actually made by a lower-level supervisor, then the discriminatory animus may be imputed to the final decisionmaker. *Id.* at 290. In this regard, the plaintiff must demonstrate that the supposed real decisionmaker did more than merely exert "influence" over the termination decision. *Id.* at 291. The lower-level supervisor must have made the actual decision to fire the plaintiff on account of his disability. *See id.*

When viewing the record most favorably to Kaufman, the claim survives challenge on a cat's paw theory. First, ample evidence exists that Koprucu amounted to little more than an empty suit. *See* ECF Nos. 59-9 & 60-11 at 10–19. Koprucu merely took the information that was given to him and accepted it without question. *See id.* He performed no independent review or investigation. *See id.* at 3–4, 9. He did not propose any alternatives short of termination. *See id.* He did not even speak with Kaufman. *See id.* at 9. Most damning, he could not testify with any real competence about the stated details of Kaufman's termination, and he did not write Kaufman's termination letter. *See id.* at 10–19; ECF Nos. 59-12 & 60-12 at 13. From this, a reasonable juror could conclude that Koprucu acted as a strawman for the real decisionmaker. *See Hill*, 354 F.3d at 288–91.

The more difficult question for the factfinder will be to ascertain who *was* the actual decisionmaker. Kaufman, to be sure, will point to ample evidence that it was Berlo. As a general matter, sufficient evidence demonstrates that Berlo's supervisors allowed her to do what she wanted within the Agency, chalking up her hostile and abusive demeanor to a "management style." *See* ECF No. 60-14 at 41. Berlo was permitted to leapfrog over Cooley and strip Kaufman of his duties and responsibilities. *See* ECF No. 60-1 at 30–32. Indeed, by Berlo's own admission, she considered the entirety of Code 105 as belonging to her and those above her in the supervisory chain did little to check her outsized view of her own authority. *See* ECF No. 59-11 at 13; ECF Nos. 59-13 & 60-4 at 14; ECF No. 60-14 at 41.

The evidence also supports that Berlo was at the center of every adverse action the Agency had taken against Kaufman. Once Berlo announced that she was going to "get" Kaufman after he requested disability accommodations, *see* ECF No. 60-15 at 44, she pressed the door lock investigation and the time and attendance inquiries. *See* ECF Nos. 59-13 & 60-4 at 38–39, 45. She further provided McConnell and Koprucu with a packet of "negative" information and openly solicited adverse commentary from Kaufman's coworkers to support his termination. *See* ECF Nos. 59-12 & 60-12 at 9; ECF Nos. 59-13 & 60-4 at 26; *see also* ECF Nos. 59-33 & 59-34.

By contrast, no one else in the supervisory chain emerges as the actual decisionmaker. Gallagher expressly took herself out of the decision-making role when she ceded her authority to Koprucu. *See* ECF No. 60-15 at 206–11; ECF No. 60-7 at 7, 22–24. And though McConnell, drafted the termination letter for Koprucu, she played a limited or no role in most decisions regarding Kaufman. *See* ECF No. 59-9 & 60-11 at 6. If anything, Kaufman could plausibly argue that McConnell had been unduly influenced by Berlo's desire to see Kaufman gone.

Where McConnell initially viewed Kaufman's time and attendance errors as benign, she quickly changed her tune after meeting with Berlo and Kaufman, and she joined Berlo in seeking his termination. *See* ECF No. 60-15 at 174–75; ECF Nos. 59-12 & 60-12 at 11. In short, a reasonable juror could conclude that despite the Agency's concerted effort to front Koprucu as the "decisionmaker" regarding Kaufman's termination, the real force was Berlo. Thus, her discriminatory animus is imputable to the Agency. *See Hill*, 354 F.3d at 305.

The Navy next argues that the Agency had several legitimate non-pretextual grounds for terminating Kaufman such that the claim fails as a matter of law. ECF No. 59-1 at 32. As a preliminary matter, the Navy contends that because Kaufman was still a "probationary employee," he could be fired for any reason or none at all. ECF No. 59-1 at 1, 29–34. This may be, so long as the real reason for Kaufman's termination is not discriminatory. *See Jennings*, 2023 WL 4567976, at *15. It matters not whether Kaufman was on probation; if he is fired because of his disability, the claim is actionable. *See id.*

Turning to the Agency's stated reasons for Kaufman's termination. For each, Kaufman has poked sufficient holes in their legitimacy to render this issue incapable of resolution on summary judgment. Chief among them pertains to Kaufman's time and attendance errors. After an extended investigation of all Code 105 employees, the Agency determined timekeeping errors were widespread and so no employee would be disciplined. *See* ECF No. 60-7 at 30–31; ECF No. 60-14 at 31–32; ECF Nos. 60-12 & 59-12 at 27; *see also* ECF No. 60-15 at 39. Yet the Agency used Kaufman's violations as grounds to fire him. *See* ECF Nos. 59-5 & 59-21. Berlo, with McConnell, subjected Kaufman to unmatched scrutiny. *See* ECF Nos. 59-12 & 60-12 at 13; ECF Nos. 59-13 & 60-4 at 45. They examined his timekeeping in five-minute increments and chided him for failing to recall why he logged certain time entries. *See* ECF No. 60-1 at 40; ECF

19

No. 60-3 at 4–5; *see also* ECF No. 59-24 (McConnell's meeting notes where Kaufman said repeatedly that he did not remember his time and did not have access to the timesheets). Given the Agency's inconsistent approach to punishing Kaufman (but not others) for time and attendance violations, a reasonable juror could conclude this stated ground was pretextual.

Likewise, as to the Agency's claim that Kaufman was fired for leaving an interior door unlocked, ECF No. 59-21 at 3, sufficient evidence reflects that this reason, too, is "unworthy of credence." *Walker*, 775 F.3d at 211. This singular incident resulted in no breach of security and the door lock itself was defective and needed to be replaced. *See* ECF No. 60-14 at 11–12; ECF No. 60-15 at 108–113; ECF No. 59-31. Moreover, even though the breach occurred in December of 2018, the Agency took no action against Kaufman until his termination six months later. *See* ECF No. 60-15 at 253. From this, a reasonable juror could conclude the Agency fronted this reason as a cover for discrimination.

Kaufman was also supposedly terminated because he failed to complete the Contracting Officer Representative ("COR") training by January 8, 2019. ECF No. 59-21 at 2. But again, the record bespeaks a confusing whirlwind of conflicting messages in this respect. When Kaufman began his job, financial COR responsibilities were not part of his initial job description. ECF No. 60-1 at 42; ECF No. 60-3 at 2–3. By extension, Cooley believed Kaufman did not have to complete the COR training. ECF No. 60-3 at 2–3. Once Berlo decided Kaufman needed to complete the training, she would not let him do so virtually as she had allowed others to do. *See* ECF No. 60-1 at 42; ECF No. 59-11 at 31–32. Further, Kaufman's mid-year evaluation praised him for his COR work. ECF No. 60-1 at 42; ECF No. 60-16 at 52–53. On this record, a reasonable juror could discredit his purported failure to complete the COR training as a real reason to terminate Kaufman.

Next, the Agency claims Kaufman was fired because of his alleged untimely and insufficient completion of a Naval Nuclear Propulsion Instruction assignment.  ECF No. 59-21 at 2.  Kaufman demonstrates that he had two such assignments.  ECF No. 60-1 at 42–44.  For the first, Vandroff told Kaufman he need not complete it.  ECF No. 60-1 at 43; ECF No. 60-16 at 80.  Vandroff also testified that he did not remember having concerns about how Kaufman handled performance on that assignment.  ECF No. 60-14 at 47–48.  For the second, Kaufman attests he had completed the assignment within 24 hours of its due date and received praise for having completed it so quickly.  ECF No. 60-1 at 43; ECF No. 60-16 at 65–66.  The irregularities in this stated ground could cause a reasonable juror to find this, too, "unworthy of credence."  *See Walker*, 775 F.3d at 211.

Finally, Kaufman's termination had been due in part to his lack of "professionalism" based on coworker commentary regarding his abrasiveness.  ECF No. 59-21 at 4.  Berlo evidently solicited at least some of the comments in preparation for Kaufman's termination.  *See* ECF Nos. 59-33 & 59-34; ECF No. 60-15 at 104–05.  Further, one of the referenced interactions took place before Kaufman's favorable initial evaluation and was never mentioned as problematic, which begs the question about its true significance.  *See id.*; ECF No. 60-16 at 24–32.  From this, a reasonable jury could find that the Agency's explanations for Kaufman's termination are simply not to be believed, and instead amount to pretext for discrimination.

In the end, Kaufman has adduced sufficient evidence from which a reasonable juror could conclude that Berlo wanted to, and did, fire Kaufman on account of his disability.  *See Hill*, 354 F.3d at 305.  The record supports an inference that Koprucu, the on-paper firing authority, merely rubberstamped that which Berlo in fact directed.  *See id.* at 290.  Because sufficient

evidence reflects Berlo to be the juggernaut behind Kaufman's termination, the claim survives challenge.  The motion as to Count II is denied.

### 3.  Retaliatory Harassment (Count III)

Kaufman also alleges that he was subjected to a barrage of adverse and hostile treatment because he had complained about Berlo having treated him adversely on account of his disability.  ECF No. 18 ¶¶ 258–64.  To survive summary judgment on retaliatory harassment, Kaufman must point to some evidence that: (1) he engaged in a protected activity; (2) the employer took an adverse action against him; and (3) a causal link exists between the two. *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 217 (4th Cir. 2016).  For the harassing conduct to be sufficiently retaliatory, it must be the kind of conduct that would "dissuade a reasonable worker from making or supporting a charge of discrimination."  *Laurent-Workman v. Wormuth*, 54 F.4th 201, 217 (4th Cir. 2022) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).

The Navy does not challenge the sufficiency of the evidence on two of the three elements, namely whether Kaufman engaged in a protected activity and any causal relationship between the protected activity and the alleged adverse treatment.  *See Guessous*, 828 F.3d at 217. This is for good reason.  The record supports that Kaufman engaged in protected activities in seeking accommodations for requested travel, *see* ECF Nos. 59-6 & 60-10 at 26–27, and when he filed a formal EEO complaint, ECF No. 60-15 at 1.  And as for a causal connection, all relevant events occurred within a few months of each other and were sufficiently close in time to allow the reasonable inference that the adverse conduct was in response to Kaufman's protected activity.  *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 123 (4th Cir. 2021).

The Navy instead contends that any purported adverse treatment does not amount to "severe or pervasive" harassment.  ECF No. 59-1 at 31.  For the reasons already discussed, *see supra* Section III(B)(1), the Court disagrees.  Almost immediately after Kaufman asked for some leeway in his travel to accommodate his disabilities, Berlo set her sights on "getting" him, through unreasonable work assignments, hostility, and even physical violence.  *See, e.g.*, ECF No. 60-1 at 26–27, 30, 33, 38; *see also Laurent-Workman*, 54 F.4th at 216–17 (supervisor's "unpredictable management decisions and acts of sabotage" are sufficient).  Additionally, on the same day the EEO Office emailed Berlo about Kaufman's formal EEO charge, Berlo yelled at Kaufman so loudly that the entire office could hear.  ECF No. 60-15 at 54, 222, 230.  Last, when Kaufman asked to be removed from Berlo's supervision while his EEO complaint was pending, Vandroff launched a formal investigation into the "lock incident"—an event that had already been resolved by informal inquiry and chalked up to a failed lock.  *See* ECF No. 60-14 at 11; ECF No. 60-15 at 242, 253; ECF No. 60-1 at 52.  On these examples alone, the trier of fact could conclude that a reasonable employee would be chilled in either seeking reasonable accommodations or pursuing a formal EEO process.  *See Laurent-Workman,* 54 F.4th at 217.  Thus, the motion as to Count III is denied.

### 4. Retaliatory Discharge (Count IV)

The Court lastly turns to the retaliatory discharge claim.  Similar to retaliatory harassment, the plaintiff must adduce some evidence that he engaged in a protected activity and because of the protected activity, he was fired.  *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 577–78 (4th Cir. 2015).  Once he makes that showing, the burden shifts to the defendant to articulate a legitimate non-retaliatory reason for the plaintiff's termination.  *Id.*  The burden next shifts back to the plaintiff to demonstrate the proffered reasons for terminating his employment

were pretextual, that is "'unworthy of credence' or [were] a cover-up for unlawful discrimination." *Walker*, 775 F.3d at 211 (quoting *Burdine*, 450 U.S. at 256); *see also Haulbrook v. Michelin North America, Inc.*, 252 F.3d 696, 706 (4th Cir. 2001).

As to this claim, the Navy singularly contends that the Agency had sufficient grounds for terminating Kaufman and there is no evidence of pretext.  ECF No. 59-1 at 31–36.  The Court rejects this argument for the same reasons already discussed.  *See supra* Section III(B)(2).  A reasonable jury could conclude that the Agency's explanations for Kaufman's termination are "unworthy of credence," and instead were a subterfuge for discharging him because he persisted in seeking accommodations and pursuing EEO relief.  *See Walker*, 775 F.3d at 211.  Thus, the motion as to Count IV is denied.

## IV.    Conclusion

For the foregoing reasons, the Court grants Kaufman's motion for leave to file a surreply and denies the Navy's motion for summary judgment.  A separate Order follows.


  March 5, 2024
_____
Date

/s/
_____
Paula Xinis
United States District Judge